## Riddell v. Commonwealth.

Sept. 28, 1943.

J. M. Wolfinbarger for appellant.

Hubert Meredith, Attorney General, and Jesse K. Lewis, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

The appellant has appealed from a judgment of the Estill circuit court sentencing him to two years in the state reformatory under an indictment charging him with the offense of stealing a public record from the office of the county court clerk of Estill county. The sole ground relied on and urged for reversal of the judgment is that the evidence is insufficient to sustain a conviction.

On or about August 4, 1942, there was filed in the office of the county court clerk of Estill county a paper or petition of the required number of voters of Estill county requesting the county judge to call a local option election to take the sense of the voters of the county on the proposition of whether or not spirituous, vinous, or malt liquors should be legally sold in Estill county. The petition was filed on Tuesday and during that week, up to the time the clerk's office was closed on Saturday evening, a number of people who were interested in the matter examined the petition, but according to the undisputed evidence of two deputy clerks—Mildred Wolfinbarger and Joe Wolfinbarger—who were in charge of the office in the absence of Maggie Wolfinbarger, the clerk, the petition was in the office lying on a desk in the vault when the office was closed at about 5 o'clock on Saturday evening of August 8. On Monday morning, August 10, when the deputy clerks opened the office they discovered that the petition was absent and there was found lying on the floor around the desk on which the petition was left on Saturday evening, several matches, some of which had been used and others not used, and also a paper bearing the name of "Sam Riddell," the appellant, who had been working for the Western Contracting Company, then engaged in constructing the Blue Grass Ordnance Depot at Richmond, Kentucky. The paper was dated August 4, 1942, and reads as follows:

"To: Sam Riddell . . . . . . Social Security No. 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 W. C. C. Badge No. 3516 . . . . . . Other . . . . . . Laborer This is to notify you that your services with Western Contracting Corporation have been terminated as of this date.

REASON: ...... Unsatisfactory ...... Gross earnings this 1st ......; 2nd ......; 3rd ......; 4th ...... quarter of 1942, ...... $111.00 ...... Total Social Security deductions this quarter, $1.11 ......

Blue Grass Ordnance Depot
Richmond, Ky.''

Joe Wolfinbarger, who worked at the desk from which the stolen document had been taken and where the above paper or notice bearing appellants' name was found, testified that he did not see the paper about the desk, on the floor, or any place about the office when he closed the desk on Saturday evening or at anytime before it was found on Monday morning following. Mildred Wolfinbarger, who worked part time at the same desk, testified that when they closed the office on Saturday evening the stolen petition in question was left on the desk in the vault where she and Joe Wolfinbarger worked. She said that just before they closed the office on Saturday evening she swept the floor and around the desk, as was her custom to do each evening before closing the office, and the matches and paper found on the floor on Monday morning were not there when the office was closed on Saturday evening. There is a stairway leading from the clerk's office to the basement which has the usual basement windows just above the ground, and upon investigation to ascertain whether or not the clerk's office had been broken into it was discovered that a windowpane had been broken and entrance made to the basement and thence by the stairway to the main office from which the document had been taken. It was shown by witnesses for the Commonwealth and also admitted by appellant that he, appellant, was in the town of Irvine from about 9 o'clock a. m. Saturday, August 8, until about 11 o'clock or later Saturday night, and was there again on Sunday, August 9.

Appellant testified that he came to town about 9 o'clock a. m. Saturday and when asked what he did while he was there on that day he said: ''I just had two or three fights down here, and was drinking pretty much.'' He said he was twice put in jail on that day and after he was released from jail the first time he was informed that they had another warrant for him and he began looking for Brown McGeorge to go on his bond, and in search of McGeorge he went into the clerk's office

and saw a number of people there but he did not state whether or not he was about the desk where the stolen document was kept and near which the paper bearing his name was found. In a few minutes after that the sheriff took charge of him and took him to jail the second time but he was released within a short time. He said that he did not sign any bond but it appears from other evidence that Brown McGeorge signed the bond, thus obtaining his release from jail the second time. He said that after he was released from jail he stayed about town, played pool at a pool room near a place where beer was sold, until about 11 o'clock, at which time he made arrangements with Vernon Parsons to take him home in his automobile and that Brown McGeorge went with them to his, McGeorge's, home in the same car and he went on to his home with Vernon Parsons and stayed at home that night but went back to Irvine on Sunday and stayed around Irvine and Ravenna until 4 o'clock p. m. He denied that he took the document in question from the clerk's office or ever saw it or as much as knew such a document had been filed. Brown McGeorge testified that on Saturday night, August 8, he went as far as his home, which is about four miles out in the country, in the same car with appellant and Vernon Parsons and when he got out of the car he left appellant in the car with Parsons but he did not know whether or not he went back to town or where he went or where he stayed the remainder of the night. Vernon Parsons was not present at the trial and appellant said that the reason he did not have him summoned as a witness in his behalf was that he heard that he was in a hospital. He admitted that he made no effort to have him summoned or made any investigation as to whether or not he was in a hospital or whether or not he was available as a witness. He produced no member of his family or any one in an effort to corroborate him with respect to his whereabouts after 12 o'clock Saturday night, nor whether or not he went home on Sunday night, or where he stayed that night.

With reference to the paper or notice of discharge found in the clerk's office, appellant said that he had been working at the ordnance depot at Richmond and had been discharged along about the first of August but that he did not remember the exact date. He said he received a notice of discharge but when presented with the notice found in the clerk's office he was unable to identify it as being the one he had received but said he received

a paper from his employer which he put in his pocket book. He said after he was released from jail the second time on Saturday, August 8, he missed his pocket book which contained $1.50 in money, his social security card, and perhaps other things, and had not found them or seen them since. He was asked if the company for which he was working owed him the sum of $111 at the time he was discharged and he said he did not remember how much they owed him but that when he was discharged he was paid $59. During the course of his testimony he was asked three times whether or not he received any more money from his employer after he was paid the $59, and on the first occasion he said he did not remember whether he did or not and on the second occasion he said he did not think so, and finally on re-direct examination, in response to a question by his counsel as to whether or not he remembered if any more money was sent to him after he was paid the $59, he answered: "No, sir, I never did get no more." But it appears that this belated positive answer was obtained by pressure, more or less, after he had twice refused to give a positive answer. He further testified that there was another "Sam Riddell" who lived in the same community where he lived and who had worked for the same company and had "quit" work or had been "laid off" about August 1 but he did not know the exact date. He did not claim, however, that this other Sam Riddell received a written notice of discharge like or similar to the one found in the clerk's office which, beyond reasonable doubt, belonged to appellant regardless of how it found its way to the clerk's office. He said he had not seen Sam Riddell for sometime and did not know where he was. Apparently he made no effort to locate the other alleged Sam Riddell or make any attempt to ascertain whether or not he had been discharged on August 4, or how much his employer owed him, or other facts which might tend to show that the paper found in the clerk's office might have belonged to the other Sam Riddell; nor was there any evidence tending to show that the other alleged Sam Riddell was in the town of Irvine, or about the clerk's office between August 4 and August 10. Appellant having made no effort, except by his own testimony, to prove that Vernon Parsons took him to his home on Saturday night, August 8, or that he stayed there the remainder of the night, nor made any effort to account for his whereabouts on Sunday night of August 9, are circumstances worthy of some considera-

tion by the jury in weighing his testimony and arriving at a verdict.

In Chambers v. Commonwealth, 200 Ky. 295, 254 S. W. 906, 907, Chambers was indicted and convicted for stealing corn from an unlocked crib on his neighbor's farm. The prosecuting witness found a small memorandum book lying on the floor of the crib. The only distinguishing mark upon the book was a single entry which read, "Brother John J. Chambers, $1." Some admittedly genuine signatures of Chambers were introduced and there was evidence to the effect that the handwriting in the book corresponded with his signature. There was no other evidence introduced tending to connect Chambers with the offense. He denied committing the offense, or being connected with it in any way, and also denied ownership of the book and denied that he had written the entry mentioned or that he had any knowledge of either it or the book. After pointing out the rule that a conviction in a criminal case may be had upon circumstantial evidence alone is subject to the qualification that if the evidence be as consistent with defendant's innocence as with his guilt, it is insufficient to support a conviction, the court said:

"It will be observed that the only evidence tending to connect defendant with the commission of the offense is the book containing the memorandum, 'Brother John J. Chambers, $1.' apparently in defendant's handwriting. This could be considered as indicating his ownership and possession of the book in question, and if it established this fact it could be deduced logically that he lost the book, and therefore had been at the place where it was found. This reasoning is consistent with his guilt.

"On the other hand, the memorandum indicates that John J. Chambers had either subscribed or paid $1 to some undisclosed undertaking. If such was the fact it would seem more natural for the one to whom he had made the payment or subscription, to have possession of the book than for him to have been carrying it. In the ordinary course of business one does not refer to himself as 'brother,' and the entry itself indicates that its reference was to another than the bearer. At least the inference is as strong that a third party so held the book with this memorandum, whether charge or credit, as it is that he

was so doing. If carried by a third party the logical conclusion is that it was lost by him, and, this being the only evidence connecting the appellant with the offense, it follows that such evidence is as consistent with his innocence as with his guilt, and therefore was not sufficient to support his conviction.''

We think that the facts pointed out in the first paragraph of the opinion quoted above as being consistent with guilt, is applicable to the present case. But for the other circumstances pointed out in the second paragraph of the opinion, which the court said was equally consistent with innocence, the inference is that the court would have held the evidence sufficient to sustain the conviction. In the present case, unlike the case supra, we have no conflicting circumstances that could be said to be consistent with innocence, or which might militate against the circumstances which are consistent with guilt. We merely have the denial of appellant that he committed the offense charged in the indictment. We think the chain of circumstantial evidence produced in favor of the Commonwealth, contradicted only by the bare denial of guilt by appellant, presented a question for the jury and that the evidence is sufficient to sustain the verdict.

Judgment affirmed.